IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2018 Session

## VICKI BAUMGARTNER, PERSONAL REPRESENTATIVE OF THE ESTATE OF RICHARD R. BAUMGARTNER v. TENNESSEE CONSOLIDATED RETIREMENT SYSTEM

**Appeal from the Chancery Court for Davidson County**
**No. 17-0067-IV    Russell T. Perkins, Chancellor**

———————————————————

### No. M2017-01715-COA-R3-CV

———————————————————

This appeal involves the forfeiture of the retirement benefits of a former Tennessee trial judge after he was convicted in federal court of numerous felonies arising out of his official capacity as a trial judge and constituting malfeasance in office. The former trial judge appealed the termination of his benefits and participated in a contested case proceeding before an administrative law judge, who ultimately determined that the retirement benefits were properly terminated based on the felony convictions and that the statute requiring such forfeiture was not unconstitutional as applied to the former trial judge. The chancery court agreed with these conclusions. We likewise conclude that the application of the forfeiture statute did not unconstitutionally impair the pension contract of the former trial judge, nor did it unilaterally impose an impermissible retrospective law or constitute an excessive fine. We further conclude that the retirement benefits were suspended as of the appropriate date, despite the former trial judge's insistence to the contrary. Accordingly, we affirm the decision of the chancery court and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

William T. Ramsey and Benjamin C. Aaron, Nashville, Tennessee, for the appellant, Vicki Baumgartner.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Brad H. Buchanan, Senior Counsel, for the appellee, Tennessee Consolidated Retirement System.

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Richard Baumgartner entered judicial office in 1992 as a Tennessee state trial judge in Knox County, Tennessee. Upon assuming office, Baumgartner elected to become a member of the Tennessee Consolidated Retirement System ("TCRS"). He was re-elected to public office as a state trial judge in subsequent years and most recently in August 2006. On March 10, 2011, Baumgartner left public office, and he applied for retirement benefits from TCRS days later. Baumgartner's application was processed in April 2011, and he began drawing retirement benefits retroactive to the effective date of his retirement.

On May 15, 2012, Baumgartner was indicted by a federal grand jury of seven felony counts of misprision of a felony for concealing a federal drug trafficking conspiracy between June 2009 and October 2010 (dates occurring while he was still in office).[1] On November 2, 2012, Baumgartner was found guilty by a jury of five of the seven felony counts. He concedes that the convictions arose out of his official capacity as a state judge and constituted malfeasance in office. After the denial of his motion for new trial, Baumgartner was sentenced on April 10, 2013. He appealed his convictions to the United States Court of Appeals, Sixth Circuit, which overturned one conviction but upheld the other four. *See U.S. v. Baumgartner*, 581 F. App'x 522 (6th Cir. 2014) *cert. denied* 136 S.Ct. 30 (Oct. 5, 2015).

Effective November 2012, after the jury returned its guilty verdict, TCRS suspended Baumgartner's TCRS retirement benefits pursuant to Tennessee Code Annotated section 8-35-124, which provides for the forfeiture of a person's retirement benefits from TCRS if that person is convicted of a felony arising out of his or her official capacity constituting malfeasance in office. Baumgartner pursued the appeal process through TCRS and eventually sought review in a contested case proceeding pursuant to the Uniform Administrative Procedures Act. The case was assigned to an

---

[1] "The federal misprision statute criminalizes the concealment of *federal* felonies." *U.S. v. Baumgartner*, 581 F. App'x 522, 529 (6th Cir. 2014). The misprision statute provides:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C.A. § 4. To sustain a conviction against a defendant, four elements must be proven beyond a reasonable doubt: "(1) the principal committed and completed the felony alleged; (2) the defendant had knowledge of the fact; (3) the defendant failed to notify the authorities; and (4) the defendant took affirmative steps to conceal the crime of the principal." *Baumgartner*, 581 F. App'x at 526 (quoting *U.S. v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988)).

administrative law judge ("ALJ"). The relevant facts were undisputed, and the ALJ ultimately granted summary judgment to TCRS upon concluding that Baumgartner's retirement benefits were properly terminated based on his felony convictions. The ALJ also rejected Baumgartner's as-applied challenge to the constitutionality of the aforementioned forfeiture statute. Baumgartner sought further review before the TCRS Board of Trustees, but the Board entered and adopted the decision of the ALJ as the final order in the administrative proceeding.

Baumgartner then filed a petition for judicial review in the chancery court of Davidson County. After reviewing the record, the chancery court concluded that the actions of TCRS in terminating Baumgartner's retirement benefits were in accordance with the governing statute and "entirely constitutional." Baumgartner timely filed a notice of appeal. After the appellate briefs were filed in this matter, Baumgartner died, and his wife was substituted as a party as the personal representative of his estate. For consistency, we will continue to refer to the appellant simply as "Baumgartner."

## II. ISSUES PRESENTED

Baumgartner raises the following issues on appeal, which we have only slightly reworded:

1. Whether the state and federal constitutions prohibit application of Tennessee Code Annotated section 8-35-124(a)(3) to Baumgartner, as he joined the state retirement system and completed the minimum amount of creditable service to qualify for retirement benefits before the effective date of the most recent amendment adding subsection (a)(3);
2. Whether the state and federal constitutional prohibitions on excessive fines preclude a total forfeiture of nearly $4,900 per month in retirement benefits and more than 22 years of creditable service under the circumstances of this case; and
3. Whether the statutory requirement in Tennessee Code Annotated section 8-35-124(b)(1) to stop retirement benefits upon "initial conviction" refers to the date the judgment of conviction was entered rather than the date of the guilty verdict.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.[2]

---

[2] Baumgartner also mentioned in his brief and reply brief on appeal issues such as lack of consideration to support a contractual modification of his retirement contract and breach of the duty of good faith and fair dealing. However, the trial court made no ruling on either of these issues, and the three issues presented for review on appeal in Baumgartner's brief do not mention these matters. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012); *see also In re Brown*, 470 S.W.3d 433, 450 n.6 (Tenn. Ct. App. 2015) (quoting *Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008)) ("'Courts have consistently held that issues must be included in the Statement of

### III. STANDARD OF REVIEW

"[T]he Board of Trustees of the Tennessee Consolidated Retirement System is an agency within the definition of § 4-5-102(2)" of the Uniform Administrative Procedures Act. *Crawford v. Tenn. Consol. Ret. Sys.*, 732 S.W.2d 293, 296 (Tenn. Ct. App. 1987). Accordingly, the UAPA sets out the standard of review we apply when reviewing a final administrative decision of the TCRS. *See Shoffner v. Tenn. Consol. Ret. Sys.*, No. M2014-00070-COA-R3-CV, 2014 WL 7432123, at *4 (Tenn. Ct. App. Dec. 29, 2014). Specifically:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

An ALJ is authorized to decide a case on summary judgment grounds. *Shoffner*, 2014 WL 7432123, at *4 (citing Tenn. Code Ann. § 4-5-308(a); *Yokley v. State Bd. of Educ.*, 305 S.W.3d 523, 526-27 (Tenn. Ct. App. 2009); Tenn. Comp. R. & Regs. 1360-4-1-.01(3), 1360-4-1-.09(2)). In that case, on appeal, we apply the well-known requirements applicable to summary judgment and review the decision de novo with no presumption of correctness. *Id.* at *5.

Likewise, issues regarding statutory and constitutional interpretation are matters of law, which we review de novo with no presumption of correctness afforded to the conclusion of the court below. *In re Bentley D.*, 537 S.W.3d 907, 910 (Tenn. 2017).

---

Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals.'"). We have limited our review on appeal to the issues listed in Baumgartner's brief.

## IV. DISCUSSION

### A. *Constitutionality of Applying section 8-35-124(a)(3)*

The first issue raised on appeal is whether the state and federal constitutions prohibit application of the current version of Tennessee Code Annotated section 8-35-124(a)(3) to Baumgartner, as he joined the state retirement system and completed the minimum amount of creditable service to qualify for retirement benefits before the effective date of the most recent amendment adding subsection (a)(3).

We note at the outset that Tennessee's pension forfeiture requirement is not unique. Many states have pension forfeiture statutes, in varying forms. *See* James B. Jacobs et al, *Pension Forfeiture: A Problematic Sanction for Public Corruption*, 35 Am. Crim. L. Rev. 57, 58 (1997) ("[P]ension forfeiture is becoming increasingly popular. Although pension forfeiture statutes differ in detail, they basically provide that upon conviction of certain criminal offenses, some public servants forfeit their right to receive pension benefits or a portion thereof.")

When Baumgartner became a trial judge and a member of TCRS in 1992, existing Tennessee law provided the following with regard to government employees and elected or appointed officials:

> No employee or elected or appointed official of the state or any political subdivision thereof shall be entitled to receive retirement benefits from the Tennessee Consolidated Retirement System, any superseded retirement system or any other public pension system if such employee or official shall be convicted in any court of the State of Tennessee of a felony arising out of his employment or official capacity, constituting malfeasance in office.

*See* 1982 Tenn. Pub. Acts, c. 927, § 4 (amending Tenn. Code Ann. § 8-35-116(b)(1) to add such language).[3] This section applied to persons who became members of public pension plans after July 1, 1982, such as Baumgartner. *See* 1982 Tenn. Pub. Acts, c. 927, §§ 4, 6. Notably, the statute provided for forfeiture of retirement benefits upon a conviction in any court of this state, but the statute did not originally include federal court. *See id.*

One year after Baumgartner became a trial judge and a member of TCRS, the General Assembly amended the relevant statute by designating the existing language as subsection (a)(1) of Tennessee Code Annotated section 8-35-124 and reiterating that it

---

[3] At some point between 1988 and 1993, Tennessee Code Annotated section 8-35-116(b)(1)(E), containing the aforementioned language, was renumbered as section 8-35-124. The date of renumbering is unclear but is not relevant for purposes of our analysis.

would apply "only to persons who bec[a]me members of public pension plans after July 1, 1982." 1993 Tenn. Pub. Acts, c. 508, §§ 1-2. The General Assembly provided that a newly added subsection (a)(2) would apply to "persons who become members of public pension plans on or after the effective date of this act," which was May 31, 1993, and subsection (a)(2) provided:

> Notwithstanding any other law to the contrary, no employee or elected or appointed official of this state or any political subdivision thereof shall be entitled to receive retirement benefits from the Tennessee Consolidated Retirement System, any superseded retirement system or any other public pension system, if such employee or official is convicted in any state *or federal court* of a felony arising out of his employment or official capacity, constituting malfeasance in office.

*Id.* (emphasis added).[4] Because Baumgartner was a member of TCRS before May 31, 1993, subsection (a)(2) did not apply to him.

Effective February 15, 2006, the statute was amended again, to its current form, through the "Comprehensive Governmental Ethics Reform Act of 2006." *See* 2006 Tenn. Pub. Acts (1st Ex. Sess.), c. 1, § 42(a). The 2006 amendment retained subsections (a)(1) and (a)(2), discussed above, for government employees and elected or appointed officials, but it further added subsection (a)(3) that provides the following only with regard to *elected* officials:

> Notwithstanding any other law to the contrary, each time a person is elected to a public office of this state or any political subdivision thereof, such person shall, as a condition of such election, be deemed to consent and agree to the forfeiture of such person's retirement benefits from the Tennessee Consolidated Retirement System, any superseded retirement system or any other public pension system if such person is convicted in any state or federal court of a felony arising out of that person's official

---

[4] The 1993 amendment also added subsection (f), which provides:

Any person convicted of a felony as provided in this section may elect, within six (6) months of his conviction, to have a monthly retirement allowance paid to whomever he had designated as beneficiary on file with the retirement system at the time of his conviction; provided, however, such beneficiary must have been his spouse or child at the time of his conviction. The benefits shall be paid to such beneficiary following the person's death and upon meeting all other eligibility requirements applicable to a beneficiary. The amount of any allowance payable hereunder shall be equal to the retirement allowance which would have been payable had the person retired under the survivorship option elected.

1993 Tenn. Pub. Acts, c. 508, § 6.

capacity, constituting malfeasance in office. Notwithstanding the provisions of § 8-35-124(e) or any other law to the contrary, this subdivision (a)(3) shall apply regardless of the date the person became a member of the public pension system, such person having consented to the provisions of this subsection as a condition of such election.

*Id.*; *see* Tenn. Code Ann. § 8-35-124(a)(3).

Thus, in its current form, the statute contains the following pertinent sections:

(a)(1) No employee or elected or appointed official of the state or any political subdivision thereof shall be entitled to receive retirement benefits from the Tennessee consolidated retirement system, any superseded retirement system or any other public pension system, if such employee or official is convicted in any court of this state of a felony arising out of the employee's or official's employment or official capacity, constituting malfeasance in office.

(2) Notwithstanding any other law to the contrary, no employee or elected or appointed official of this state or any political subdivision thereof shall be entitled to receive retirement benefits from the Tennessee consolidated retirement system, any superseded retirement system or any other public pension system, if such employee or official is convicted in any state or federal court of a felony arising out of that person's employment or official capacity, constituting malfeasance in office.

(3) Notwithstanding any other law to the contrary, each time a person is elected to a public office of this state or any political subdivision of this state, such person shall, as a condition of such election, be deemed to consent and agree to the forfeiture of such person's retirement benefits from the Tennessee consolidated retirement system, any superseded retirement system or any other public pension system, if such person is convicted in any state or federal court of a felony arising out of that person's official capacity, constituting malfeasance in office. Notwithstanding subsection (e) or any other law to the contrary, this subdivision (a)(3) shall apply regardless of the date the person became a member of the public pension system, such person having consented to this subdivision (a)(3) as a condition of such election.
. . .
(e) Subdivision (a)(1) applies only to persons who become members of public pension plans after July 1, 1982. Subdivision (a)(2) applies only to persons who become members of public pension plans on or after May 31, 1993.

Tenn. Code Ann. § 8-35-124.

Baumgartner stood for re-election and was re-elected in August 2006, after the February 15, 2006 effective date of the 2006 amendment adding subsection (a)(3). Still, he insists that it is unconstitutional to apply subsection (a)(3) to him to require forfeiture of his retirement benefits because he had already completed the minimum amount of creditable service to qualify for retirement benefits before the effective date of the 2006 amendment. To require forfeiture of his benefits, he contends, would violate the constitutional prohibitions against the impairment of contracts and retrospective laws. *See* U.S. Const. art. I, § 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"); Tenn. Const. art. I, § 20 ("[N]o retrospective law, or law impairing the obligations of contracts, shall be made."). Baumgartner claims that he had a contractual right to receive benefits according to the terms of the law in effect when he completed the minimum amount of creditable service to qualify for retirement benefits, and under that law, forfeiture was not required based on felony convictions in *federal* court. He contends that the 2006 amendment "changed the terms of his contract and thus impaired it." For "essentially the same reasons" expressed in his argument regarding impairment of contracts, Baumgartner claims that his rights with respect to his retirement benefits were fixed and that any later detrimental modifications could not be retrospectively applied to him.

A series of decisions from the Tennessee Supreme Court provides guidance on this issue. First, the court decided *Miles v. Tennessee Consolidated Retirement System*, 548 S.W.2d 299, 300 (Tenn. 1976), which was a suit for declaratory judgment brought by several retired and active judges challenging the constitutionality of 1975 legislation changing the terms of their pension plans in connection with the newly created TCRS. The judges argued that the 1975 legislation constituted an unconstitutional retrospective law impairing their contracts with the State. *Id.* at 301. The Tennessee Supreme Court separated its discussion of the retired judges from that regarding the active judges. The retired judges had retired or resigned and ended their terms of service prior to the 1974 elections, while each of the active judges was re-elected in 1974, "thereby commencing a term of office." *Id.* at 302.

For the retired judges, the supreme court held that the State of Tennessee had entered into "a contract with [the retired judges] to pay them a pension upon their retirement *in accordance with the law in effect at that time*, setting the pension for [the retired judge] at the time of his retirement and for [the judge who resigned] at the time of his resignation." *Id.* at 304 (emphasis added). The court held that these judges had "completed their contracts with the State of Tennessee" when they retired or resigned, so that the terms of their pensions were those established by the statutes existing at that time. *Id.* Because the subsequently enacted 1975 legislation would reduce those benefits, the court held that the legislation impermissibly impaired the contract between the State of Tennessee and the retired judges. *Id.* The court explained,

[A]n offer of a pension, the acceptance of same, and the completion of the

service of the employee, creates a vested interest in said pension which will not be denied either to the participant or his family.

The Appellants insist that the General Assembly is empowered to reasonably modify pension benefits, even if vested. We do not agree. Such power is not available to the General Assembly in the absence of a showing that a vital interest of the State must be protected by an exercise of the police power.

*Id.* at 305.

Next, the *Miles* Court addressed the arguments from the active judges, who were re-elected and began another term of office on September 1, 1974. *Id.* at 306. The supreme court concluded that "the State of Tennessee entered into a contract with these Judges for a period of eight (8) years" and that "these Judges relied upon the promises of the State, *as set forth in the statutory retirement scheme in existence on September 1, 1974, when they commenced the eight (8) year term of their employment.*" *Id.* (emphasis added). The 1975 legislation would "impair the terms of this contract" and were therefore unconstitutional. *Id.* The court explained,

'The Legislature may strengthen the actuarial fibers but it cannot break the bonds of contractual obligations. The permissible changes, amendments and alterations provided for by the Legislature can apply only to conditions in the future, and never to the past. According to the cardinal principle of justice and fair dealings between government and man, as well as between man and man, the parties shall know prior to entering into a business relationship the conditions which shall govern that relationship. Ex post facto legislation is abhorred in criminal law because it stigmatizes with criminality an act entirely innocent when committed. The impairment of contractual obligations by the Legislature is equally abhorrent because such impairment changes the blueprint of a bridge construction when the spans are half way across the stream.'

*Id.* (quoting *Hickey v. Pittsburg Pension Bd.*, 378 Pa. 300, 106 A.2d 233, (Pa. 1954)).

Five years after *Miles*, the supreme court decided *Blackwell v. Quarterly County Court of Shelby County*, 622 S.W.2d 535 (Tenn. 1981), wherein the court considered the extent to which *a local legislative body* could validly modify the terms of a pension plan it had previously adopted for its public employees. At the outset, the supreme court emphasized that "this opinion deals only with public employees whose compensation and term of office are not governed by special provisions of the state constitution, as were those of all of the judges involved in the *Miles* case[.]" *Id.* at 537. The court explained that the public employees at issue in *Blackwell* could not be said to have "contracts" similar to those of the judges in the *Miles* case. *Id.* at 540. Accordingly, the supreme

court said that the *Miles* case had "only limited application" to the issues before it. *Id.* at 537.

The county employees in *Blackwell* argued that "no detrimental change whatever, regardless of how reasonable or necessary for the financial integrity of the plan, could legally be made [to the plan] without unanimous consent of all affected beneficiaries." *Id.* at 539. Even in the absence of a contract of employment, the supreme court agreed that "[a]t some point after an employee has performed services or has paid into a pension and retirement plan, he acquires fixed and immutable rights in the system." *Id.* at 540. In that circumstance, the court explained that the employee's rights "are subject to the terms and conditions of the pension plan" and that "no contractual rights, *other than those conferred by the plan*, exist simply by reason of employment." *Id.* (emphasis added). Still, the supreme court recognized that revisions and modifications in retirement and pension systems "are almost inevitably required." *Id.* at 540-41. The court went on to say,

> [W]e are not convinced that a plan is "frozen" against detrimental changes or modifications the moment an employee begins to participate in it, where such changes are necessary to preserve the fiscal and actuarial integrity of the plan as a whole. It seems to us that public policy demands that there be a right on the part of the public employer to make reasonable modifications in an existing plan if necessary to create or safeguard actuarial stability, provided that no then accrued or vested rights of members or beneficiaries are thereby impaired.

*Id.* at 541. After citing some Tennessee statutes regarding pension plans, the supreme court found that the "inescapable" conclusion was that "the General Assembly considers that reasonable modifications may be made in public pension plans in order to keep them actuarially sound." *Id.* at 542. The plaintiffs relied on a provision of a private act stating that the provisions of the system would "constitute vested interests" between the members and the county. *Id.* However, the court interpreted this to mean that the members had "vested interests" in the assets of the retirement system but not in "the precise clauses and terms of the plan as it existed at the inception of their employment, so as to render the same immutable and beyond necessary amendment by the governing body." *Id.* The court noted the "varied and conflicting views" taken around the country regarding "the rights of public officers and employees who are within the coverage of a statutory pension system." *Id.* Ultimately, the court adopted "the so-called Pennsylvania rule, which permits reasonable modifications when necessary to protect or enhance actuarial soundness of the plan, provided that no such modification can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance." *Id.* at 543. This rule, the court concluded, served "the public interest requiring a reasonable amount of flexibility on the part of the public employer." *Id.*

Applying this rule to the facts before it, the supreme court concluded that the county employees who were eligible for retirement benefits under the terms of the plan existing before the county's proposed modification had a "right" that could not "validly be taken from them *without their consent*[.]" *Id.* (emphasis added). In other words, the new provisions could not be adversely applied to those employees who had the requisite minimum number of years of creditable service in the system. *Id.* However, the new provision could be applied to employees who did not yet have such eligibility, as the evidence showed that the change met the requirements of the Pennsylvania rule. *Id.*

One month after the *Blackwell* decision was issued, the supreme court had occasion to apply it and the Pennsylvania rule in *Roberts v. Tennessee Consolidated Retirement System*, 622 S.W.2d 544, 544-45 (Tenn. 1981), a case involving changes to the retirement benefits of two assistant attorneys general of the State. Noting that the Pennsylvania rule applies "with respect to alterations in retirement pension plans for public employees," the court found *Blackwell* determinative of the issue before it. *Id.* at 545. According to the court, *Blackwell* held that:

> [A] public employer could make changes in such a plan when reasonably required for the fiscal integrity of the plan, even though such changes were detrimental to the beneficiaries of the plan, 'provided that no such modification can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance.'

*Id.* (quoting *Blackwell*, 622 S.W.2d at 535). Again, the court concluded that an adverse change in the plan could not be applied to an employee who, as of the effective date of the amendment, already had the minimum requisite years of creditable service under the plan. *Id.* The court reiterated that the Pennsylvania rule protects against "changes which adversely affect credits, rights and benefits accrued as the result of and attributable to years of service rendered prior to the effective date of such changes." *Id.* at 545. Briefly, the court acknowledged the appellants' argument that an assistant attorney general in that case had "acquiesced in the 1975 amendment and [was] therefore precluded from challenging it." *Id.* Without additional discussion, the court simply concluded that the "evidentiary record" before the court did not support the appellants' contention. *Id.*

Finally, in *Felts v. Tennessee Consolidated Retirement System*, 650 S.W.2d 371 (Tenn. 1983), the supreme court considered a case involving changes to the retirement benefits of a former Tennessee Supreme Court justice. Justice Felts became a member of the Tennessee Supreme Court in 1960, the relevant statute defining his retirement rights was amended to his detriment in 1963, and he retired in 1965. *Id.* at 372. The suit was brought seeking a declaration that this change was an unconstitutional impairment of his contract with the State. *Id.* at 373. Relying on *Miles*, the court of appeals had concluded that the justice was entitled to pension benefits according to the relevant statute in effect in 1960, as that was the version of the statute in effect when his term began and "a part of

the employment contract." *Id.* at 374. The supreme court found no error in the decision of the court of appeals and affirmed it in all respects. *Id.* at 375. The supreme court discussed the *Miles* case as it applied specifically to judges but also said that in *Blackwell* and *Roberts*, the court had "dealt more comprehensively with issues concerning the vesting of rights under retirement pension plans for government officials and employees as well as the extent to which such plans may be altered to the detriment of beneficiaries." *Id.* at 374. The court summarized the rule from these cases as follows:

> [A] public employer may make changes in such a plan when reasonably required to do so for the fiscal integrity thereof, even though such changes be detrimental to the beneficiaries of the plan, except that, no such modification can be permitted to adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance.

*Id.* Applying "the rule of these later cases as well as under *Miles*," the supreme court concluded that the rights of Justice Felts had already vested when the amendment at issue became effective in 1963. *Id.* The court concluded that the justice's retirement benefits should be determined "under the statutes as they existed in 1960," when he began his last term of office. *Id.* at 375.

The supreme court was also asked to find that Justice Felts "waived his rights to the greater benefits to which he was entitled under [the statute] as it existed in 1960" because he "indicated his acceptance of the modifications" by accepting a reduced benefit amount for a number of years. *Id.* Considering the facts in the record, the court found no basis for concluding that Justice Felts "ever voluntarily and knowingly relinquished or abandoned the right to have his pension benefits determined under the provisions of [the statute] as it existed in 1960." *Id.* His receipt of reduced benefit checks did not amount to a knowing waiver because there was no evidence that he was aware that the amount received was incorrect. *Id.*

Several guiding principles can be gleaned from these decisions.[5] *Miles* demonstrates that the State of Tennessee enters into a contract with judges for a period of eight years commencing with each term of office. 548 S.W.2d at 306. The terms of that contract are "set forth in the statutory retirement scheme in existence . . . when they commence[] the eight (8) year term of their employment." *Id.*; *see also Felts*, 650 S.W.2d at 375 (looking to the retirement statutes as they existed when Justice Felts began his final term of office to determine his pension rights). During the term of the eight-year contract, the state cannot modify the statutory retirement scheme to "adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement

---

[5] The Tennessee Supreme Court also applied *Blackwell* and the Pennsylvania rule in *Knox Cty. v. City of Knoxville*, 786 S.W.2d 936, 941-42 (Tenn. 1990).

allowance." *Blackwell*, 622 S.W.2d at 543; *see also Felts*, 650 S.W.2d at 374-75. Judges who have the requisite minimum number of years of creditable service in the system have certain rights that cannot "validly be taken from them without their consent[.]" *Blackwell*, 622 S.W.2d at 543. However, courts will consider whether the individual acquiesced in the change, *Roberts*, 622 S.W.2d at 545, or waived his or her right to have pension benefits determined under the law as it existed at the beginning of the term of office. *Felts*, 650 S.W.2d at 375.

We now apply these principles to the facts of this case. If the General Assembly had simply amended the pension forfeiture statute during Baumgartner's last term to impose a condition requiring forfeiture of his benefits upon conviction of a felony in federal court, we would apply the Pennsylvania rule to analyze his contention that the modification unconstitutionally impaired his contract with the state. However, that is not what happened. The 2006 amendment, by itself, did not change the terms or conditions of Baumgartner's existing retirement plan. Rather, the amendment provided that each time someone is elected to public office, then "as a condition of such election," that person will be "deemed to consent and agree"[6] to forfeiture of TCRS retirement benefits if convicted of a felony arising out of his or her official capacity constituting malfeasance in office. Tenn. Code Ann. § 8-35-124(a)(3). If Baumgartner had chosen not to seek re-election after the effective date of the amendment adding subsection (a)(3), his retirement benefits would have remained subject to subsection (a)(1) of the statute and would not have been subject to forfeiture based on a conviction in federal court. In other words, the State of Tennessee did not unilaterally impose a detrimental modification of the terms of the contract without Baumgartner's consent. The new forfeiture provision would not have applied absent his decision to stand for re-election, indicating his consent. Baumgartner waived his right to have his pension benefits governed by subsection (a)(1) and impliedly consented to the modification of his contract for his next term by seeking re-election, as this was "a condition of such election." *Id.*

A somewhat analogous pension forfeiture provision was considered by this Court in *Simmons v. Hitt*, 546 S.W.2d 587, 591 (Tenn. Ct. App. 1976). In that case, electric company employees were participants in a pension plan that provided that they would forfeit their interest in the plan if discharged for dishonesty or disloyalty. *Id.* at 589. The

---

[6] The same or similar language can be found in other statutes. *See, e.g.*, Tenn. Code Ann. § 8-37-208 ("Every member shall be deemed to consent and agree to the deductions herein provided as a condition of membership."); *Hogan v. U.S.*, 513 F.2d 170, 171, 175 (6th Cir. 1975) (discussing a federal statute providing that federal employees were "deemed to consent and agree" to deductions from pay for a retirement fund, which "appear[ed] in form to create an irrebuttable presumption that each employee has consented to the deductions" and effectively made employee participation "a mandatory condition of employment"); *Miller v. Comm'r of Internal Revenue*, 144 F.2d 287, 288-89 (4th Cir. 1944) (considering a federal act providing that every employee "shall be deemed to consent and agree" to salary deductions for retirement and concluding that the employee accepted employment subject to the condition that he was deemed to consent and agree to the deduction).

- 13 -

plan provided that no amendment could reduce the interest of a participant in the plan without his or her written consent. *Id.* Despite this provision, the plan was re-written without the knowledge or consent of the participants to expand the forfeiture provision to also require the forfeiture of benefits if an employee entered employment in direct competition with the employer. *Id.* at 590. Still, the plan provided that no amendment would operate to deprive any participant of any benefits that vested prior to such amendment. *Id.* at 591. This Court emphasized the significance of this provision, noting that the parties had stipulated that the plaintiff-employees had vested benefits prior to the amendment and that this section was "conclusive" as to their accrued interests. *Id.*

We stated that "except for certain other provisions of the Plan noted hereinabove, and which are referred to hereinafter, we think the provision that an employee who leaves and goes into direct competition with his employer forfeits his participation in the fund might be enforced, assuming notice and acceptance of such provision by the employees." *Id.* We explained that "'[t]he law does not favor forfeitures, and they will be strictly construed and enforced only within both letter and spirit of law, but they are not illegal and will generally be enforced unless justice and equity are violated.'" *Id.* (quoting *Sanders v. Sanders*, 288 S.W.2d 473, 479 (Tenn. Ct. App. 1955)). After recognizing the contractual nature of the rights at issue, the Court went on to say:

> We are unable to escape the conclusion that the provision in the plan that no amendment should reduce the interest of a participant in the trust property as of the time of the amendment without the written consent of the participant is a valid provision and that, according to the evidence in this record, no written consent of the plaintiffs who were under the plan at that time was obtained and, in fact, no effort was made by the defendants to advise the employees of this action or to gain their consent.
>
> We are of opinion that the change in the provision of Art. VI. Sec. 1, from one that provided forfeiture in the event of dishonesty and disloyalty to one that provided for forfeiture in the event that the employee went into direct competition with the employer amounted to a reduction of the interest of the plaintiffs in the trust property and, therefore, without the consent of the participant, was not enforceable.
>
> . . . .
>
> [O]ne who is employed on terms which include a particular profit sharing plan has a right to expect that the plan will continue unchanged until he is notified otherwise. Even though the plan is in fact changed, the terms of employment, including rights in the profit sharing plan remain unchanged until the employee is notified and thereby *given opportunity to decline to work on the new terms. If, after notification, the employee continues to work, this would be an acquiescence i[n] or acceptance of the amended plan* in respect to rights accruing thereafter.

- 14 -

*Id.* at 591-92 (emphasis added).

*Simmons* highlights the contractual nature of the issue before us and reinforces our conclusion that an employee can acquiesce in and indicate acceptance of terms of an amended pension plan by continuing to work after notice of the change. We recognize that the *Simmons* court limited its discussion to acceptance of a change in terms "in respect to rights accruing thereafter." *Id.* at 592. However, it appears that the Court may have limited its discussion based on the parties' stipulation as to their already accrued interests. *See id.* at 591. As a matter of consent, if a participant can accept a change in terms that applies to rights accruing thereafter, that same participant should be permitted to accept and consent to a change in terms that explicitly applies to all existing benefits. The 2006 amendment did just that. Subsection 8-35-124(a)(3) unequivocally required "forfeiture of such person's retirement benefits from the Tennessee consolidated retirement system[.]" Baumgartner does not argue that this broad language would not encompass all benefits or that he was unaware of this change in terms.

Because section 8-35-124(a)(3) relies on the consent of the re-elected judge, it does not run afoul of *Blackwell* or the Pennsylvania rule. In fact, our conclusion is strongly supported by a decision of the Supreme Court of Pennsylvania in a case with strikingly similar facts and a comparable pension forfeiture provision. In *Shiomos v. Commonwealth, State Employes' Retirement Board*, 626 A.2d 158, 160 (Pa. 1993), the appellant was a judge who entered judicial office and became a member of the state employees' retirement system in 1972. In 1978, a new act was passed, designated as the Public Employee Pension Forfeiture Act, which provided that public employees who were convicted of specifically enumerated crimes would forfeit their right to receive pension benefits. *Id.* Judge Shiomos acquired the necessary ten years of creditable service in 1979, so his entitlement to receive retirement benefits vested at that time. *Id.* He began another term of office in 1982 and retired in 1984 but continued to serve as a senior judge. *Id.* In 1988, Judge Shiomos was convicted of two counts of the federal offense of extortion, premised on the fact that he extorted approximately $300 from two different individuals by use of his position as a senior judge. *Id.* The retirement board notified him that his pension was forfeited as a result of his conviction in federal court. *Id.* Judge Shiomos challenged the decision and asserted that the forfeiture act resulted in an unconstitutional impairment of his contract. *Id.* The court considered the fact that Judge Shiomos assumed a second term of office in 1982 *after* the effective date of the statute to be a "pivotal fact" in its decision. *Id.* at 162. The Court explained:

> Admittedly the terms and conditions of Shiomos' pension contract were set in 1972 when he first assumed judicial office. Had Shiomos retired in 1982 without assuming any additional public service his pension contract would not be subject to the forfeiture provisions of Act 140 . . . . However, when appellant Shiomos <u>assumed his second term in office</u> in 1982 he did so fully aware of the existence of Act 140 and its applicability to public

- 15 -

employees in his position. Section 3 of Act 140 declares: "Each time a public officer or public employee is elected, appointed, promoted, or otherwise changes a job classification, there is a termination and renewal of the contract for purposes of this act." 43 P.S. § 1313(c). By assuming his second term in office subsequent to the enactment of Act 140 appellant became subject to Act 140 and the terms and conditions of Act 140 were incorporated into his renewed pension contract. . . .

Further, appellant's argument that only his pension benefits accumulated after 1982 should be subject to forfeiture is rejected in accordance with section 3 of Act 140:

> Notwithstanding any other provision of law, no public official or public employee nor any beneficiary designated by such public official or public employee *shall be entitled to receive any retirement or other benefit or payment of any kind* except a return of the contribution paid into any pension fund without interest, if such public official or public employee is convicted or pleads guilty or no defense to any crime related to public office or public employment.

43 P.S. § 1313(a); P.L. 140, § 3 (emphasis added).

As a reasonable condition of public employment, the employee reaffirms his commitment to perform his job with honesty and integrity every time he or she begins a new term of office, receives a promotion or appointment, or experiences a change in job classification; regardless of whether such public employment is on a full or part-time basis. With each appointment there is a renewal of the agreement to perform the term of public service without violating Act 140; an agreement which encompasses all that has gone before. Thus, whether or not a public employee's right to receive retirement benefits has vested, or he or she is in actual receipt of benefits, all previous accumulated rights to receive such benefits are subject to forfeiture by and through the "renewed" agreement which is formed each time a person chooses to become a "public official" as defined by § 1312.

It is neither unconscionable nor unreasonable to require honesty and integrity during an employee's tenure in public service. Nor is it violative of the Pennsylvania Constitution to provide that at every new term of employment a public official or employee renews and amends his or her pension contract to include the new public service and to place at risk that which may have already been earned. Such is the nature of the public employment agreement.

- 16 -

*Id.* at 162-63 (underlining added, italics in original).

The reasoning of *Shiomos* is persuasive here—as an elected official, when Baumgartner began another term of office in 2006, the terms and conditions of subsection (a)(3) were incorporated into his amended pension contract. On appeal, Baumgartner argues that *Shiomos* and the Pennsylvania pension forfeiture statute are distinguishable because the Pennsylvania act specifically stated, "Each time a public officer or public employee is elected, appointed, promoted, or otherwise changes a job classification, there is a termination and renewal of the contract for purposes of this act." *Id.* at 162. Section 8-35-124(a)(3) does not contain this precise language. However, it does not apply to all *public officers or public employees*, like the Pennsylvania law, nor does it apply to promotions or changes in job classifications. Instead, subsection (a)(3) is limited to persons elected to public office. It provides that "*each time a person is elected . . .* such person shall, as a condition of such election, be *deemed to consent and agree* to the forfeiture of such person's retirement benefits" if convicted of a felony arising out of that person's official capacity constituting malfeasance in office. Tenn. Code Ann. § 8-35-124(a)(3) (emphasis added). In our view, the "termination and renewal of the contract" language is not necessary given the fact that subsection (a)(3) only applies each time a person is elected and thereby beginning a term of office. As our Supreme Court explained in *Miles* when discussing the active judges, for each new term of office, "the State of Tennessee enter[s] into a contract with [the judge] *for a period of eight (8) years*," and for its terms, we look to "the promises of the State, *as set forth in the statutory retirement scheme in existence . . . when they commence[] the eight (8) year term* of their employment." 548 S.W.2d at 306 (emphasis added); *see also Felts*, 650 S.W.2d at 375. And in any event, regardless of Baumgartner's argument regarding the renewal of the existing contract, he could consent to a change in its terms. The lack of the specific language in the Pennsylvania statute is not fatal to the validity of subsection (a)(3), as Baumgartner suggests.[7]

---

[7] Prior to the passage of the 2006 amendment adding subsection (a)(3), the Tennessee Attorney General was asked to opine as to the constitutionality of a bill patterned after the Pennsylvania forfeiture statute, pursuant to which *public employees and public officials* would be deemed, upon re-election, promotion, appointment or change in classification to consent to forfeiture of their public retirement benefits if convicted of a felony arising out of their public employment. Tenn. Op. Att'y Gen. No. 05-152 (Oct. 4, 2005). The Attorney General opined that such a bill would be constitutional. However, in the course of its opinion, the Attorney General placed great weight on the language of the Pennsylvania law providing that "[e]ach time a *public officer or public employee* is elected, appointed, promoted, or otherwise changes a job classification, there is a termination and renewal of the contract for purposes of this act." *Id.* (quoting 43 Pa. Cons. Stat. Ann. § 1313(c)) (emphasis added). The Attorney General suggested that "the existence of a provision in the law terminating and then re-instituting membership makes a crucial difference in applying a pension plan modification to an employee who was already a member of T.C.R.S. when that modification was adopted" and suggested that the proposed bill would need to "make this necessary change in membership rights." *Id.* Subsection (a)(3) as adopted did not contain any language altering membership rights, but again, it only applies to elected officials beginning a

For the same reasons, we reject Baumgartner's assertion that the 2006 amendment violates the constitutional prohibition against retrospective laws impairing vested rights. The constitutional guarantee against retrospective laws prohibits retrospective substantive legal changes that "'take away or impair vested rights acquired under existing laws or create a new obligation, impose a new duty, or attach a new disability in respect of transactions or considerations already passed.'" *Estate of Bell v. Shelby Cty. Health Care Corp.*, 318 S.W.3d 823, 829 (Tenn. 2010) (quoting *Doe v. Sundquist*, 2 S.W.3d 919, 923 (Tenn. 1999)). Baumgartner had a contract with the State of Tennessee for a period of eight years, subject to the terms of the retirement scheme in effect when he commenced his term of office. He consented to application of subsection (a)(3) by seeking re-election in 2006, and his contract that began in 2006 incorporated the terms of subsection (a)(3). The State of Tennessee did not unilaterally impose an impermissible retrospective law, as Baumgartner was not forced to accept or consent to application of this provision.

Next, Baumgartner argues that two general statutes were part of his original pension contract and prohibit any impairment of or modification to his retirement benefits. The first statute is Tennessee Code Annotated section 8-34-204, which was included in the original act creating the Tennessee Consolidated Retirement System in 1972. *See* 1972 Tenn. Pub. Acts, c. 814, § 17. It provides:

> Every provision of chapters 34-37 of this title shall be subject to amendment or repeal by any session of the general assembly; provided, that no such amendment or repeal shall diminish or annul, in any respect, any right acquired by a member or beneficiary under chapters 34-37 of this title.

Tenn. Code Ann. § 8-34-204. Broadly reading this statute, Baumgartner argues that it prevented any legislative changes from altering "any of his rights" once he completed eight years of creditable service. From our research, it appears that the only Tennessee case discussing this statute in depth is *Blackwell*.[8]

As we mentioned before, in *Blackwell*, the employees argued, like Baumgartner, that "no detrimental change whatever . . . could legally be made" to their plan without unanimous consent of all affected beneficiaries, "regardless of how reasonable or necessary for the financial integrity of the plan." 622 S.W.2d at 539. Along these lines, the court of appeals held that the employees at issue had a vested right to earn benefits

---

new term of office, not all public employees and public officials, as originally contemplated. Thus, we do not consider a provision terminating and renewing membership rights as necessary given the more limited nature of the amendment.

[8] The *Miles* case contains some discussion of the statutory history in its recitation of the decision of the chancellor. 548 S.W.2d at 301. The predecessor to this statute was also cited by the plaintiffs in *Bates v. Tennessee Consolidated Retirement System ex rel. Ashley*, 563 S.W.2d 192, 196 (Tenn. Ct. App. 1977), but the court deemed the statute inapplicable because the plaintiffs had no legal or vested rights to be preserved by the statute.

under "the plan as it existed and under the conditions of the plan as it existed" when they entered the service of the county and accepted the plan. *Id.* at 537. Applying strict principles of contract law, the court of appeals held that the employing government "could not validly enact a modification or change detrimental to any employee." *Id.* The supreme court disagreed and held that "necessary changes in public employee pension plans may be made by the governing body to the extent and under the conditions hereinafter discussed." *Id.* Notably, the supreme court discussed the very statute on which Baumgartner relies in reaching this conclusion:

> While we agree with the implicit holding of the courts below that a public employer may from time to time offer additional benefits which employees may accept expressly or by acquiescence, nevertheless we are not convinced that a plan is "frozen" against detrimental changes or modifications the moment an employee begins to participate in it, where such changes are necessary to preserve the fiscal and actuarial integrity of the plan as a whole. It seems to us that public policy demands that there be a right on the part of the public employer to make reasonable modifications in an existing plan if necessary to create or safeguard actuarial stability, provided that no then accrued or vested rights of members or beneficiaries are thereby impaired.
>
> This, in our opinion, is the announced public policy of this state through several legislative enactments. T.C.A. [§] 8-34-204, dealing with the Tennessee Consolidated Retirement System, provides as follows:
>
>> "Every provision of chapters 34 through 37 of this title shall be subject to amendment or repeal by any session of the general assembly, provided that no such amendment or repeal shall diminish or annul, in any respect, any right acquired by a member or beneficiary under the provisions of chapters 34 through 37 of this title."
>>
>> . . . .
>
> . . . It seems to us inescapable from these legislative provisions that the General Assembly considers that reasonable modifications may be made in public pension plans in order to keep them actuarially sound.

*Id.* at 541-42. The supreme court was quick to note that the Shelby County pension plan at issue was not part of the TCRS; however, the employees in *Blackwell* relied on a private act stating that the provisions of the retirement system would "constitute vested interests between the members [] and the County of Shelby." *Id.* at 542. Despite this broad language, the supreme court concluded that the term "vested interests" in the private act meant that "employees had interests in the assets of the retirement system, but not, as indicated by the Court of Appeals, in the precise clauses and terms of the plan as it existed at the inception of their employment, so as to render the same immutable and

beyond necessary amendment by the governing body." *Id.* (footnote omitted). Again, the supreme court went on to adopt the Pennsylvania rule, "which permits reasonable modifications when necessary to protect or enhance actuarial soundness of the plan, provided that no such modification can adversely affect an employee who has complied with all conditions necessary to be eligible for a retirement allowance." *Id.* at 543. In sum, the *Blackwell* Court acknowledged and discussed the very statute on which Baumgartner relies, and despite its seemingly broad language stating that no amendment could "diminish or annul, in any respect, any right acquired by a member," Tenn. Code Ann. § 8-34-204, the supreme court still held that "necessary changes in public employee pension plans may be made by the governing body to the extent and under the conditions herein[] discussed." *Blackwell*, 622 S.W.2d at 537.

Because we have already concluded that applying subsection (a)(3) to Baumgartner based upon his consent does not run afoul of the Pennsylvania rule set forth in *Blackwell*, we likewise conclude that it is not precluded by Tennessee Code Annotated section 8-34-204. Baumgartner's narrow interpretation of the statute is akin to the approach of the *Blackwell* Court of Appeals, which the Tennessee Supreme Court expressly rejected.

The second general statute on which Baumgartner relies is Tennessee Code Annotated section 8-35-114, which provides:

> The classification and membership rights of any member or prior class member of the retirement system shall continue in force without interruption and remain applicable as long as such member remains in a position for which such classification originated.

Again, we reject Baumgartner's suggestion that this statute had the effect of "freezing" all laws governing the TCRS and/or his pension plan from the moment he assumed the position of a trial judge. Pursuant to Tennessee Code Annotated section 8-35-105, entitled "Member classifications," the board of trustees must "classify" each person who becomes a member in one of the following groups:

> (1) Group 1. Teachers and general employees;
> (2) Group 2. State police officers, wildlife officers, game and fish officers so classified prior to April 1, 1974, firefighters and police officers;
> (3) Group 3. State judges, county judges, county officials, attorneys general, and commissioners; or
> (4) Group 4. State judges entering service on or after September 1, 1990, state judges transferring membership under chapter 34, part 7, any attorney general and reporter who meets the requirements of § 8-34-623(b) and enters service on or after July 1, 2005, and any attorney general and reporter who meets the requirements of § 8-34-623(b) and transfers

membership under chapter 34, part 7.

Beneath the listing of these groups, subsection (d) of this same "Member classifications" statute provides:

> (d) The classification and membership rights of any county judge[9] or county official who is currently a member or a prior class member of the retirement system shall continue in force without interruption and remain applicable when such member remains in the county office for which such classification eligibility originated, notwithstanding any change in the title of such office as a result of any act to implement the amendments of the Constitution of Tennessee, Article VII, § 1, ratified on March 7, 1978.

Tenn. Code Ann. § 8-35-105(d). Tennessee Code Annotated section 8-35-114, which Baumgartner cites, tracks the language used in subsection (d) but is not limited to county judges or officials: "The classification and membership rights of any member or prior class member of the retirement system shall continue in force without interruption and remain applicable as long as such member remains in a position for which such classification originated." Read in context, this statute simply provides that a member's "classification and membership rights" will continue in force without interruption so long as the member "remains in a position for which such classification originated." *Id.* It is intended to protect the employee's classification and the membership rights that result from that classification. It does not mean that all statutes governing the TCRS were somehow "membership rights"[10] that had to remain the same or "continue in force" as

---

[9] The term "county judge" is defined as:

> any person who is, or when such office existed was, a judge of a general sessions court, trial justice court, county chair, county judge, probate judge, or judge of a juvenile and/or domestic relations court, and whose compensation for such judicial service is paid wholly by a county of the state, or any person who is a county attorney who receives regular monthly or quarterly compensation from a county of the state, or any county manager or county administrator who receives regular monthly or quarterly compensation from a county of the state; provided, that no county manager or county administrator shall be eligible for membership if a county judge, chair of the quarterly county court or county mayor from that county is a member[.]

Tenn. Code Ann. § 8-34-101(8). In contrast, "state judge" is defined as "any person in office as a judge of a court of record in this state, whose salary for the judge's judicial position has been paid during the period of the judge's service wholly from the treasury of the state, including the administrative director of the courts." *Id.* at (44). For state judges, a separate statute provides, "Nothing in this section or § 8-34-703 or §§ 8-34-706--8-34-713 shall be construed to change the retirement classification or remove from the system of which such judge is a member any state judge who continues in a state judicial office." Tenn. Code Ann. § 8-34-704.

[10] Although not determinative for purposes of our analysis, we also recognize the dubious nature of the "right" Baumgartner is claiming here. In effect, Baumgartner is attempting to claim an irrevocable

long as Baumgartner remained in the same position of a trial judge, for the same reasons set forth in *Blackwell.* The protections of this statute simply do not extend to the lengths urged by Baumgartner.

For all of these reasons, we reject Baumgartner's argument that TCRS's application of subsection (a)(3) to require forfeiture of his retirement benefits was an unconstitutional impairment of contract or impermissible retrospective law.

## B.   Excessive Fine

Next, Baumgartner argues that requiring forfeiture of his pension benefits pursuant to subsection (a)(3) would constitute an unconstitutional excessive fine. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); Tenn. Const. art. I, § 16 ("[E]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted").[11] Baumgartner notes that he served as a trial judge and accumulated over 22 years of creditable service, while the events that led to his convictions occurred in the last 13 months of his career. He claims that it is unconstitutionally excessive to require forfeiture of nearly $4,900 in monthly pension benefits based on these felony convictions.

The Eighth Amendment was "intended to prevent *the government* from abusing its power to punish[.]" *Austin v. U.S.*, 509 U.S. 602, 607 (1993). Accordingly, "'the Excessive Fines Clause was intended to limit only those fines directly imposed by, and payable to, the government.'" *Id.* (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco*

_____

"membership right" to commit a felony so long as he was convicted in federal court and not state court. The Florida District Court of Appeals rejected a similar argument in *Shields v. Smith*, 404 So. 2d 1106, 1112 (Fla. Dist. Ct. App. 1981), where an employee argued that once he completed ten years of creditable service, entitling him to retirement benefits, "his rights vested in the sense of freezing the list of forfeiture crimes then existing" in the forfeiture statute, such that additional felonies could not be added later. The Court rejected this "ingenious argument," stating, "Whatever vested rights Shields may have had protecting him from alteration of benefits, we cannot conceive that his vested rights included the right to commit, with impunity, any but a particular list of felonies." *Id.* (citation omitted).

[11] "The framers of the Tennessee Constitution placed an identical prohibition against excessive fines in the Declaration of Rights." *Barrett v. Tenn. Occupational Safety & Health Review Comm'n*, 284 S.W.3d 784, 787 (Tenn. 2009). The Tennessee Supreme Court has held that the Excessive Fines Clause of Article I, § 16 of the Tennessee Constitution is "coextensive with its federal counterpart" in the Eighth Amendment to the United States Constitution. *See Stuart v. State Dep't of Safety*, 963 S.W.2d 28, 34 (Tenn. 1998).

We note that the Supreme Court of Indiana, last year, ruled that the Excessive Fines Clause of the Eighth Amendment does not apply to the states. *State v. Timbs*, 84 N.E.3d 1179, 1182 (Ind. 2017), *cert. granted*, 138 S. Ct. 2650 (2018) ("The United States Supreme Court has never enforced the Excessive Fines Clause against the States, and we opt not to do so here.") The United States Supreme Court granted certiorari in that case, and it remains pending on appeal. The Tennessee Supreme Court has applied the Excessive Fines Clause of the Eighth Amendment to challenged actions of the State of Tennessee. *See Stuart*, 963 S.W.2d at 34. Following its lead, we will do the same.

*Disposal, Inc.*, 492 U.S. 257, 268 (1989)). It "is implicated only in cases initiated by the government, either in the criminal process or other direct actions to inflict punishment." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 900 (Tenn. 1992).

"[A]t the time the Constitution was adopted, 'the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense.'" *U.S. v. Bajakajian*, 524 U.S. 321, 327-28 (1998) (quoting *Browning-Ferris*, 492 U.S. at 265). Therefore, the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Id.* at 328 (quoting *Austin*, 509 U.S. at 609-10). Although some other provisions of the Bill of Rights are expressly limited to criminal cases, "[t]he text of the Eighth Amendment includes no similar limitation." *Austin*, 509 U.S. at 608. Accordingly, the question is not whether the sanction is civil or criminal, "but rather whether it is punishment." *Id.* at 610. For instance, in *Austin*, the United States Supreme Court held that the Excessive Fines Clause applied to civil *in rem* forfeitures of property (in that case, a mobile home and auto body shop) under federal statutes in connection with the appellant's violation of drug laws. *Id.* at 604-05. The Supreme Court concluded that such forfeiture under the federal statutes constituted "payment to a sovereign as punishment for some offense," and as such, the forfeiture was subject to the limitations of the Excessive Fines Clause. *Id.* at 622.

In *Stuart*, the Tennessee Supreme Court acknowledged *Austin* and likewise applied the Excessive Fines Clause to civil *in rem* forfeitures of property in connection with an illegal drug investigation and seizure. 963 S.W.2d at 34. "As a threshold matter," however, the Tennessee Supreme Court concluded that not all of the forfeited property at issue was "subject to an excessive fines analysis." *Id.* at 34-35. The court found that the forfeiture of the proceeds of the illegal drug transactions (including currency and sports memorabilia) was remedial, "not punitive because the claimant was never legally entitled to them," and therefore, the forfeited drug proceeds were "not subject to an excessive fines analysis." *Id.*

Several courts in other jurisdictions have considered Excessive Fine arguments in the context of cases involving pension forfeitures. As a threshold matter, most of these courts have held that pension forfeitures are not subject to an excessive fines analysis. In *Hopkins v. Oklahoma Public Employees Retirement System*, 150 F.3d 1155, 1157 (10th Cir. 1998), a retired state employee was convicted in federal court of accepting a bribe in connection with his employment before he retired. The employee had been credited with thirty-two years of service and was drawing a monthly pension of $4,293.18, but following his conviction, he was notified that his pension would be reduced by 70% in accordance with Oklahoma's pension forfeiture statute. *Id.* at 1157-58. The employee estimated that this reduction resulted in an estimated loss to him and his wife of $706,452.85. *Id.* at 1158. He challenged his pension forfeiture in federal court, alleging that Oklahoma's pension forfeiture statute imposed an excessive fine on him in violation of the Eighth Amendment. *Id.* The Tenth Circuit analyzed the issue as follows:

The Supreme Court has explained that the Excessive Fines Clause "was intended to limit only those fines directly imposed by, and payable to, the government." *Browning-Ferris*[,] 492 U.S. [at] 268[.] Furthermore, at the time of the drafting and ratification of the Eighth Amendment, the understanding of the term "fine" included "a payment to a sovereign as punishment for some offense." *Id.* at 265, 109 S.Ct. 2909. Implicit in this interpretation of the Excessive Fines Clause is the notion that it applies only when the payment to the government involves turning over "property" of some kind that once belonged to the defendant. *Cf. Austin*[,] 509 U.S. [at] 604 [] (applying the Excessive Fines Clause to in rem forfeitures of a drug defendant's mobile home and business).

In this case, therefore, we must decide the threshold question of whether the forfeiture of Hopkins' pension amounted to a payment of "property" by him to the state of Oklahoma. The district court ruled that under Oklahoma law, Hopkins had no "property" right in his pension benefits—even though he had already begun to receive the pension benefits—because Hopkins' right to his pension always was contingent on maintaining honorable service during his tenure in office. *See Woods v. City of Lawton*, 845 P.2d 880, 882-83 (Okla. 1992); *see also* Okla. Stat. tit. 51, § 24.1(A) (forfeiting a public employee's pension benefit upon the employee's felony conviction for "a felony or any offense involving a violation of his official oath"). When Hopkins accepted a bribe in connection with a matter then being considered by the Corporation Commission, he breached his duty of honorable service. See Okla. Const. art. 9, § 17 (specifying that the oath of office for each commissioner must include a declaration that the commission has no financial interest in any matters that come before the Commission). As a result, under Oklahoma law, Hopkins had no "vested right" in his pension benefits. *See Baker v. Oklahoma Firefighters Pension & Retirement Sys.*, 718 P.2d 348, 350–51 (Okla. 1986) ("[U]nder Oklahoma law, the right to a pension would vest, or become absolute, upon the pension recipient's becoming eligible for payment of the pension.... [T]he right of a claimant to a pension is controlled by the terms of the statute in effect when the right to a pension vests and ... vesting occurs as of the date of retirement."); *see also Board of Trustees of the Police Pension & Retirement Sys. v. Weed*, 719 P.2d 1276, 1278 (Okla. 1986) (noting the legal significance of a pension forfeiture statute that is tied to dishonorable conduct during the employee's term in office) (citing *Kerner v. State Employee's Retirement Sys.*, 72 Ill.2d 507, 21 Ill.Dec. 879, 382 N.E.2d 243, 245–46 (1978)).

We agree with the district court's interpretation of Oklahoma law, and thus, we concur that Hopkins had no property right in his pension benefits. As a result, the forfeiture of those benefits does not constitute a

"payment" to the state of Oklahoma, and this forfeiture does not violate the Excessive Fines Clause of the Eighth Amendment.

*Id.* at 1162.

The Florida District Court of Appeals applied slightly different reasoning in *Busbee v. State, Division of Retirement*, 685 So. 2d 914, 918 (Fla. Dist. Ct. App. 1996), where a public employee argued that the forfeiture of his retirement benefits was unconstitutional as an excessive fine because the amount of his pension benefits based on 31 years of service was much greater than the amount of the bribe he accepted. The court noted that the employee's pension obligation was a matter of contract and that the terms of that contract were governed by statute. *Id.* at 916. Under the governing statute, a conviction for bribery in connection with one's employment would result in forfeiture of pension rights. *Id.* "Therefore," the court concluded, "the forfeiture provision was a part of the pension contract between the appellant and the state, and to the extent that his rights vested after 10 years of service, they vested subject to this provision." *Id.* The court explained that the Excessive Fines clause is only implicated if a "fine" is "punishment." *Id.* at 917. The court concluded that it was not necessary to analyze the proportionality of the harm to the amount of pension forfeited "because this is not a punishment for Mr. Busbee's crime." *Id.* at 918. Instead, the court continued, "[t]his case involves a straightforward question of contract law and the amount of the pension which has been forfeited is irrelevant under the terms of the contract." *Id.*

Another section of the Florida District Court of Appeals followed and expanded on *Busbee* in *Childers v. State, Department of Management Services, Division of Retirement*, 989 So. 2d 716 (Fla. Dist. Ct. App. 2008), wherein the Court succinctly explained:

> Forfeiture of the employee's retirement benefits is not a fine because the employee has not been ordered to pay anything to the government. Unlike a criminal forfeiture statute, section 112.3173(3) merely relieves the State of its duty to pay retirement benefits. . . . .
> Here, the State entered into a contract with the employee, promising to pay him benefits upon his retirement. That contract included a condition precedent: the employee must refrain from committing specified offenses prior to retirement. The non-occurrence of that condition foreclosed the employee's right to performance. It is as direct and to the point as that. There simply is no violation of the Excessive Fines Clause. "This is not a prosecution under Florida criminal law for accepting a bribe, and it is not a punishment for accepting a bribe. This is an action to enforce the terms of the pension contract and nothing more." *Busbee*, 685 So.2d at 917.

*Id.* at 719.

*Hopkins* and *Busbee* were both cited and followed by the court in *Hames v. City of Miami*, 479 F. Supp. 2d 1276, 1287-88 (S.D. Fla. 2007), *aff'd as modified sub nom.* 281 F. App'x 853 (11th Cir. 2008),[12] where another employee claimed that the forfeiture of his pension amounted to an excessive fine in violation of the Eighth Amendment. "In the pension context," the district court explained, "courts have found that an employee has no property interest in his or her pension plan for purposes of the Eighth Amendment, where the 'right to [the] pension always was contingent on maintaining honorable service during [plaintiff's] tenure in office.'" *Id.* (quoting *Hopkins*, 150 F.3d at 1162). In other words, the employee has no "vested property interest in the pension" for purposes of the Eighth Amendment where his interest was "always subject to the statutory forfeiture limitations." *Id.* at 1288. According to the court, "no matter when Plaintiff's pension 'vested,' [under Florida law,] the Eighth Amendment does not apply because it vested subject to the forfeiture provisions, and is therefore not Plaintiff's property for purposes of the Eighth Amendment." *Id.*

Finally, the Commonwealth Court of Pennsylvania reached the same result in *Scarantino v. Public School Employees' Retirement Board*, 68 A.3d 375, 384-85 (Pa. Commw. Ct. 2013).[13] The appellant argued that the forfeiture of $1.5 million in pension benefits constituted an excessive fine. *Id.* at 384. The court explained that the Eighth Amendment is only implicated if a fine is a punishment for an offense, but yet the relationship between the employee and the retirement system is contractual in nature. *Id.* at 384-85. The forfeiture statute provided for mandatory forfeiture upon conviction of a crime related to public office, and such conviction was a breach of the public employee's contract with his employer. *Id.* at 385. The court reasoned that a "condition precedent for eligibility to receive pension benefits" was that the employee could not have been convicted of one of the enumerated crimes. *Id.* Under these circumstances, pension forfeiture "was not a fine imposed for conviction of his offense" and was "not a punitive forfeiture" requiring application of the Excessive Fines analysis. *Id.* Rather, the forfeiture "resulted from a breach of the contract." *Id.* The Pennsylvania court reached the same result in *Miller v. State Employees Retirement System*, 137 A.3d 674, 681 (Pa. Commw. Ct.) *appeal denied* 160 A.3d 758 (Pa. 2016) ("[T]he forfeiture was a breach of contract. Accordingly, the Excessive Fines Clause of the Eighth Amendment is not implicated.") (quotation omitted).

Admittedly, the Supreme Judicial Court of Massachusetts disagreed with the reasoning of these cases in *Public Employee Retirement Administration Commission v. Bettencourt*, 47 N.E.3d 667 (Mass. 2016). The court considered "the threshold question [of] whether the forfeiture of a public employee's pension . . . is a 'fine' under the Eighth Amendment" and applied the same definition of a "fine" for purposes of the analysis – "a

---

[12] The appellant in *Hames* essentially abandoned the Eighth Amendment argument in his appeal to the Eleventh Circuit, so the Court declined to consider it. 281 F. App'x 853.

[13] The Commonwealth Court of Pennsylvania is an intermediate appellate court.

payment to a sovereign as punishment for some offense." *Id.* at 672-73. The court also applied the same initial approach as that taken by the Tenth Circuit in *Hopkins* – "'Implicit in [the Supreme Court's] interpretation of the Excessive Fines Clause is the notion that it applies only when the payment to the government involves turning over 'property' of some kind that once belonged to [the employee].'" *Id.* at 673 (quoting *Hopkins*, 150 F.3d at 1162). Stated differently, the court considered whether the forfeiture operated to extract payments from the employee and transfer them to the government. *Id.*

The court rejected the notion that the employee at issue had only a future interest in receiving retirement payments that was wholly contingent on not being convicted of a crime. *Id.* at 674. The court explained that the Massachusetts retirement system was a *contributory* retirement system, and under existing Massachusetts law, there could be "no change to the system" to deprive members of benefits "as long as they have paid the required contributions."[14] *Id.* at 674-75. Massachusetts courts had "long held the view" that public employees who were members of the retirement system held an interest that originated in contract but in substance amounted to a property right. *Id.* at 675. At the point when the employee at issue became a contributing member of the retirement system with deductions taken from his salary, "he acquired a protected interest in the retirement allowance provided by the retirement system that amounted to a property interest."[15] *Id.*

---

[14] The court explained the details of the system as follows:

> Under the Commonwealth's public employee retirement system, the employee makes contributions to the system during the period of his or her active employment through salary deductions. When the employee retires for superannuation (assuming no beneficiaries), he or she retires with an allowance that is comprised of an "annuity share" actuarially determined on the basis of his or her accumulated deductions, and a "pension share" that the governmental unit is required to pay and that represents "the usually considerable difference needed to make good the normal yearly allowance paid to the [employee] until his death." *Opinion of the Justices*, 364 Mass. at 854, 303 N.E.2d 320. The pension share that the employee is entitled to receive from the government during retirement is money, i.e., property. If the employee is obligated to forfeit his or her retirement allowance pursuant to § 15(4), the pension share reverts to the government; put another way, by operation of § 15(4), the pension share is effectively transferred from the employee to the government. We consider this effective transfer of property to qualify as an extraction of payment from the employee to the sovereign[.]

*Id.* at 676.

[15] The Massachusetts court in *Bettencourt* "emphasize[d] that the Legislature properly may provide for such forfeitures," 47 N.E.3d at 683, and it "did not announce a categorical rule declaring all forfeitures of retirement benefits excessive." *U.S. v. Woodward*, No. CR 95-10234-DPW, 2017 WL 4684000, at *5 n.2 (D. Mass. Oct. 18, 2017). Instead, Massachusetts courts engage in a fact-based inquiry, examining the circumstances of each conviction to determine whether complete forfeiture is proportional to the underlying offense. *Id. See, e.g.*, *State Bd. of Retirement v. Finneran*, 71 N.E.3d 1190 (Mass. 2017) (forfeiture of $433,400 not excessive when employee committed felony of obstruction of justice carrying maximum penalty of ten years' imprisonment and $250,000 fine); *Bettencourt*, 47 N.E.3d

at 676-77.  According to the court, the fact that benefits could be subject to forfeiture for misconduct did not change the character of this property right.  *Id.* at 676.  In sum, the court reasoned that the Massachusetts forfeiture statute "effects what is in substance an extraction of payments from the employee to the Commonwealth" and "is a fine within the meaning of the excessive fines clause of the Eighth Amendment."  *Id*. at 677.

Under Tennessee law, as set forth in our discussion of *Blackwell* and related cases, employees' contractual pension rights are not like those recognized in Massachusetts.  Baumgartner did not acquire a protected property interest in his retirement allowance from the moment he became a member of the retirement system, nor did he contribute any deductions from his salary, so far as the record before us shows.  In any event, subsection (b)(2) of section 8-35-124 provides that the employee or official who forfeits retirement benefits will "[r]eceive a refund of the accumulated contributions credited to the employee's or official's account, if any."

Having reviewed the decisions of these courts, we are persuaded by the reasoning of the majority approach.  The Excessive Fines Clause "applies only when the payment to the government involves turning over 'property' of some kind that once belonged to the defendant."  *Hopkins*, 150 F.3d at 1162.  Baumgartner had no absolute property right to receipt of pension benefits, within the meaning of the Excessive Fines analysis, that was not subject to the forfeiture provision contained in Tennessee Code Annotated section 8-35-124(a)(3).  His ability to receive benefits was not without conditions; it was subject to the contingency that benefits would be terminated upon conviction of a felony arising out of his official capacity constituting malfeasance in office.  Upon such conviction, the termination of pension benefits was a matter of contract and did not constitute a "fine" in the sense of extracting a "payment" to the sovereign as punishment for his offense.  Baumgartner was not ordered to pay anything (in cash or in kind) to the government; the State was merely relieved of its contractual duty to pay retirement benefits.  *See Childers*, 989 So. 2d at 719.  Therefore, the pension forfeiture was not subject to an Excessive Fines analysis.

## C.    *Date of Suspension of Benefits*

Finally, Baumgartner argues that TCRS erred in suspending his benefits based on the date when the jury returned its guilty verdict in November 2012 rather than the date of the district court's judgment of conviction in April 2013, improperly depriving him of benefits during those five months.  Regarding this issue, Tennessee Code Annotated section 8-35-124 provides:

(b) Upon initial conviction, or upon a plea of guilty or nolo contendere, any

---

at 667 (forfeiture of $659,000 constitutionally excessive for unauthorized access to state computer system and invasion of privacy).

person subject to this section shall:

(1) Have the employee's or official's benefit stopped immediately, if the employee or official is receiving a benefit; and

(2) Receive a refund of the accumulated contributions credited to the employee's or official's account, if any, less any benefits received unless the person elected to have a monthly retirement allowance paid upon such person's death in accordance with subsection (f).

(c) The employing agency is responsible for immediately notifying the administrator of the retirement system of the conviction of any person subject to this section.

(d) In the event the conviction of such person is later overturned in any court and such person is acquitted, or is granted a full pardon, the person shall be restored to all rights, privileges and benefits as if the conviction had never occurred.

Tenn. Code Ann. § 8-35-124. Baumgartner disputes the meaning of "initial conviction."

*Black's Law Dictionary* defines "conviction" as follows:

1. The act or process of judicially finding someone guilty of a crime; the state of having been proved guilty. 2. The judgment (as by a jury verdict) that a person is guilty of a crime.

*Black's Law Dictionary* (10th ed. 2014). "[W]hat is meant by 'conviction' actually depends upon the context in which it is being used." *State v. Vasser*, 870 S.W.2d 543, 546 (Tenn. Crim. App. 1993) (citing 21A Am.Jur.2d *Criminal Law* § 1023 (1981)). "Tennessee, like most jurisdictions, recognizes two distinct meanings of the term 'conviction.'" *Rodriguez v. State*, 437 S.W.3d 450, 453 (Tenn. 2014) (citing *Vasser*, 870 S.W.2d at 545).

According to our supreme court:

A conviction in the "general sense" is the establishment of guilt by a guilty plea or a verdict independent of sentence and judgment. *Vasser*, 870 S.W.2d at 546; *see also Daughenbaugh v. State*, 805 N.W.2d 591, 597 (Iowa 2011) (defining "conviction" in the "general or popular sense" as "the establishment of guilt independent of judgment and sentence"). In contrast, a conviction in its "technical" sense requires a formal adjudication by a court and the entry of a judgment of conviction. *Vasser*, 870 S.W.2d at 545-46; *see also Daughenbaugh*, 805 N.W.2d at 597 ("[W]hen the term 'conviction' is used in its technical [or] legal sense, it requires a formal adjudication by the court and the formal entry of a judgment of conviction."); *Vasquez v. Courtney*, 272 Or. 477, 537 P.2d 536, 537 (1975)

- 29 -

("The ... more technical meaning [of 'conviction'] refers to the final judgment entered on a plea or verdict of guilt."). The applicable meaning of conviction depends on the context or procedural setting in which the term is used. *Vasser*, 870 S.W.2d at 546.

*Id.* at 453-54. With "technical correctness," then, it is appropriate to say that "a conviction involves, not only a verdict, but also a sentence passed by the court[.]" *Spencer v. State*, 140 S.W. 597, 598-99 (Tenn. 1911). At the same time, however, "[i]n many of our statutes the term 'conviction' is used to signify the jury's verdict of guilty, and as something precedent to, and distinct from, judgment or sentence." *State v. Garrett*, 188 S.W. 58, 60 (Tenn. 1916). *See e.g.*, Tenn. Code Ann. § 40-20-111(a) ("When any person has been convicted of two (2) or more offenses, judgment shall be rendered on each conviction after the first . . . ."); Tenn. Code Ann. § 40-20-112 ("Upon conviction for any felony, it shall be the judgment of the court that the defendant be infamous . . . ."); Tenn. Code Ann. § 40-20-116(a) ("Whenever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another thereof, the jury shall ascertain the value of the property . . . ."). As these statutes illustrate, "the legislature often uses the word 'conviction' to denote a stage of the process occurring in the trial court after which such further action by the trial court must be taken or may be authorized." *Vasser*, 870 S.W.2d at 546. Accordingly, "'when the word 'conviction' is used in connection with the successive steps in a criminal case, the reference is to the verdict.'" *Id.* (quoting 21A Am.Jur.2d *Criminal Law* § 1024 at 569).

Here, the relevant statute provides that an official who is receiving benefits shall have his or her benefits "stopped immediately" "[u]pon initial conviction, or upon a plea of guilty or nolo contendere." Tenn. Code Ann. § 8-35-124(b). This language indicates that the legislature was referring to the initial stage of the process occurring in the trial court regarding the finding of guilt, not the final entry of a judgment of conviction. We reject Baumgartner's assertion that TCRS should have suspended his benefits on the date of sentencing rather than after the guilty verdict.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Vicki Baumgartner, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE